UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CRIMINAL ACTION NO.: 5:19-CR-00026-TBR

UNITED STATES OF AMERICA                                           PLAINTIFF

V.

WENDELL BERNARD GREEN                                         DEFENDANT

## MEMORANDUM OPINION & ORDER

This matter is before the Court upon a motion by the Defendant, Wendell Bernard Green, to suppress all evidence obtained as a result of an illegal police search in violation of the Fourth Amendment of the United States Constitution. (DN 21). The Court held a hearing on this matter on October 17, 2019. The parties have each filed their brief in this matter, and upon consideration of these submissions and being otherwise sufficiently advised, Mr. Green's motion to suppress is **DENIED.**

### Background

On December 3, 2018, Trooper Williams pulled over Mr. Green for following too closely to another car. (DN 24, Transcript, at 4-5). Trooper Williams testified that "When I first saw the car, it was extremely too close to the car that was in front of him." *Id.* at 5. Less than a vehicle's length separated the two cars. *Id.* Trooper Williams also observed that Mr. Green reduced his speed when he pulled out. *Id.* at 6. The December 3 traffic stop began at 12:08 P.M. *Id.* Upon approaching the vehicle, Trooper Williams observed "a large block object covered up with what [he] thought was a blanket at that time." *Id.* at 8. Trooper Williams testified that he has "seen this countless amount of times" and he "became suspicious after I even saw it." *Id.* at 8. Trooper Williams also testified that he immediately notice that Mr. Green was visibly nervous and even stated into his microphone during the stop that Mr. Green was "shaking like a leaf." *Id.* at 19-20.

Mr. Green presented Trooper Williams with a South Carolina driver's license and rental papers for the car. *Id.* at 7. The rental agreement was in someone else's name, who Trooper Williams later learned was Mr. Green's wife. *Id.* Upon reviewing the rental agreement, Trooper Williams learned that the car should have been returned several days prior and was late. *Id.*

Mr. Green told Trooper Williams that he was only following closely behind the other car because it had darted out in front of him. *Id.* at 9. Trooper Williams testified that Mr. Green was "[v]ery talkative, overly giddy" and that he "saw a couple of 5-Hour Energy drinks, a couple of cell phones" in the car. *Id.* At 12:09, Trooper Williams asked Mr. Green to accompany him to his patrol car. *Id.* Mr. Green complied. Once they were in the patrol car, Trooper Williams indicated that he would write Mr. Green a warning notice and would not be issuing a citation for the traffic violation. *Id.* Trooper Williams testified that issuing a warning notice involves a similar process as issuing a citation and that it is necessary to run records checks. *Id.*

While Trooper Williams was working on the warning notice, he asked Mr. Green several questions. Among these questions, he asked Mr. Green about where he came from and where he was going. *Id.* at 10. Mr. Green first indicated that he was coming from Illinois, but then corrected himself and said he was coming from St. Louis. *Id.* at 10-11. Trooper Williams asked several questions about St. Louis while he worked on the warning notice. *Id.* at 27.

At 12:11, Trooper Williams called in a K9 unit to do a sniff of Mr. Green's car. *Id.* at 11. The K9 unit arrived at 12:13. *Id.* At 12:15, Trooper Williams instructed the K9 unit to "go ahead" with the dog sniff. *Id.* At 12:17, the police dog alerted on Mr. Green's car. *Id.* at 12. Trooper Williams printed out the citation and handed Mr. Green a copy at 12:19. *Id.* The entire traffic stop lasted approximately eleven minutes.

Upon searching Mr. Green's vehicle, the police found approximately 250 pounds of marijuana packaged in vacuum sealed bags and further concealed within suitcases and duffle bags. *Id.* at 14. The search also revealed five cellular phones. The government later obtained a search warrant to search these phones.

**Legal Standard**

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Carpenter*, 819 F.3d 880, 886 (6th Cir. 2016) (quoting U.S. Const. amend. IV). If the Government disregards that constitutional command, a defendant may move to exclude the evidence gathered against him. *United States v. Haygood*, 549 F.3d 1049, 1053 (6th Cir. 2008). It is well settled that, in seeking suppression, "the burden of proof is upon the defendant to show that the search or seizure violated "some constitutional or statutory right." *United States v. Rodriquez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003) (quoting *United States v. Feldman*, 606 F.2d 673, 679 n. 11 (6th Cir. 1979)). In resolving a motion to suppress, the evidence must be viewed in the light most favorable to the Government. *United States v. Rose*, 714 F.3d 362, 366 (6th Cir. 2013) (citing *United States v. Beauchamp*, 659 F.3d 560, 565 (6th Cir. 2011)).

"When considering whether to suppress evidence in a criminal case, a court addresses a mixed question of law and fact." *Thomas v. Arnold*, 696 F.Supp.2d 882, 886 (N.D. Ohio 2010) (citing *United States v. Hurst*, 228 F.3d 751 n.1 (6th Cir. 2000)). "Therefore, a court can appropriately weigh evidence and determine credibility when deciding whether to suppress evidence." *Id.*

**Discussion**

**I.  Trooper Williams did not violate Mr. Green's Fourth Amendment rights during the traffic stop.**

Trooper Williams had probable cause to believe that Mr. Green had committed a traffic violation by driving too closely to another car and the traffic stop was not unreasonably delayed or extended by the deployment of the drug dog.

(a) *The traffic stop was lawful.*

KRS § 189.340(9)(a) provides, in relevant part, that "the operator of a motor vehicle shall not follow another vehicle more closely than is reasonable and prudent, having regard for the speed of the vehicle and the traffic upon and condition of the highway." "An officer may stop and detain a motorist so long as the officer has probable cause to believe that the motorist has violated a traffic law." *United States v. Bell*, 555 F.3d 535, 539 (6th Cir. 2009). At the suppression hearing, Trooper Williams testified "when I first saw the car, it was extremely too close to the car that was in front of him." (DN 24 at 5). The Court finds this testimony to be credible and therefore Trooper Williams had probable cause to stop Mr. Green.

Mr. Green argues that he was only following too closely because he was cut off by the other car and therefore he was not following more closely than is "reasonable and prudent." In other words, Mr. Green argues that, because the other car "darted in his lane and cut him off," he "was being a reasonable and prudent driver under the circumstances" and not violating any statute. (DN 26 at 12, 14 n.2). But this argument is immaterial to the outcome of this case. The relevant inquiry is not whether Mr. Green in fact violated the statue but instead is whether Trooper Williams had probable cause to suspect that Mr. Green violated it. There is no evidence that Trooper Williams had knowledge that the other car had darted in front of Mr. Green before the traffic stop. And the fact that Mr. Green informed Trooper Williams that the other car darted in front of him during the traffic stop does not establish that Trooper Williams was unjustified in

continuing his mission to issue a "courtesy notice" or warning citation. Because Trooper Williams had probable cause to believe that Mr. Green committed a traffic violation, the traffic stop was lawful.

(b) *The duration of the traffic stop was reasonable.*

The government argues that "[t]he traffic stop was not delayed, impermissibly, beyond its scope and the temporary detention was reasonable." The Court agrees. In *Arizona v. Johnson*, the Supreme Court explained:

> A lawful roadside stop begins when a vehicle is pulled over for investigation of a traffic violation. The temporary seizure of driver and passengers ordinarily continues, and remains reasonable, for the duration of the stop. Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave. An officer's inquires into matters unrelated to the justification for the traffic stop, this Court has made plain, do not convert the encounter into something other than a lawful seizure, so long as those inquires do not measurably extend the duration of the stop.

555 U.S. 323, 333 (2009). "A seizure that is justified solely by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). Furthermore, "conducting a dog sniff [does] not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner. . . ." *Id.* at 408.

The Sixth Circuit clarified the reasonableness requirement in *United States v. Everett*, 601 F.3d 484 (6th Cir. 2010). The *Everett* court explained that "the proper inquiry is whether the totality of the circumstances surrounding the stop indicates that the duration of *the stop as a whole*—including any prolongation due to suspicionless unrelated questioning—was reasonable." 601 F.3d at 494. This test requires the Court to "conduct a fact-bound, context-dependent inquiry in each case." *Id.* at 493.

Furthermore, and of great importance to this case, the *Everett* court explained:

> Importantly, in evaluating whether an officer's prolongation of a traffic stop through extraneous questions indicates a lack of diligence, the *subject* of those questions, no less than their quantity, is part of the "totality of the circumstances" of the stop, and is therefore a relevant consideration. That is to say, some questions are "far[ther] afield" than others. . . . For instance, even our sister circuits that, pre-*Muehler*, took the most restrictive view toward traffic-stop questioning permitted certain locomotion-related inquires not strictly directed to the motorist's conduct at the time of the stop, such as "[the] motorist's travel history and travel plans" and "the driver's authority to operate the vehicle," because such questions "may help explain, or put into context," why the motorist was committing the suspicious behavior the officer observed. . . . Such context-framing questions will rarely suggest a lack of diligence.

*Id.* at 494 (citations omitted). Therefore, Trooper William's questions regarding St. Louis and where Mr. Green was coming from do not bespeak a lack of diligence. The Court does not consider these context-framing questions as contributing to any unreasonable prolongation of the traffic stop.

Even assuming *arguendo* that the St. Louis questions were unrelated to the purposes of the traffic stop, these questions are appropriate so long as they do not measurably extend the duration of the stop. The St. Louis questions were asked concurrently to Trooper William's efforts to complete and issue the courtesy notice. Throughout the entirety of the conversation between Mr. Green and Trooper Williams in the police cruiser, Trooper Williams was typing on his computer, communicating on his radio, and otherwise actively pursuing the completion of the warning notice. In *United States v. Bell*, the Sixth Circuit found that no Fourth Amendment violation occurred where the officer asked the motorist questions "while writing the warning" because "there [was] no evidence that this discussion extended the time to write the warning." 555 F.3d 535, 542-43 (6th Cir. 2009).

The facts of *United States v. Bell* are strikingly similar to those in this case. In *Bell*, the defendant was pulled over for speeding, the officer deployed a drug dog, the dog alerted on the defendant's vehicle, and the defendant was arrested for possessing a controlled substance. *Id.* at 536. Bell was driving a rental car. *Id.* Three-minutes into the traffic stop, the officer radioed for the drug dog to come to the scene. *Id.* at 537. Like the case before this Court, there were issues on the face of the car's rental agreement.[1] *Id.* The drug dog arrived approximately ten minutes after the traffic stop was imitated. *Id.* When the dog arrived, the officers decided to issue a traffic warning notice to Bell and asked him to exit the vehicle. *Id.* at 538. Then,

> [a]t approximately eleven minutes into the stop, Bell exited the vehicle and walked to the front of the vehicle, where he and Trooper Roberts sat on the guardrail and Trooper Roberts wrote out the warning and continued to question Bell about his story. . . . Trooper Roberts admitted that he had Bell exit the vehicle only so that the dog could perform a sniff and not specifically for Roberts to issue the warning. . . . While Bell and Trooper Roberts were seated on the guardrail, at approximately twelve minutes into the stop, the dog approached Bell's car and began to sniff. . . . The dog sniff took approximately one minute and thirty-eight seconds overall, at which time [the K9 officer] confirmed to Sergeant Helton that the dog had alerted. . . .

*Id.* Bell was arrested for possession with intent to distribute a controlled substance. *Id.* The *Bell* court "conclude[d] that the dog sniff was not unlawful because Bell's detention was not unreasonably delayed beyond the purposes of the initial stop in order to effect the search." *Id.* at 541. The defendant in *Bell* argued "that reasonable suspicion is required unless all of the Officers' actions were focused precisely on the purpose of the stop with no deviation whatsoever." *Id.* The Sixth Circuit disagreed and held that the actions of the officer must only be "reasonably related to the purpose of the stop and not have unreasonably delayed the stop." *Id.* at 542 (quotation marks omitted). The court then explained:

---

[1] Bell's rental agreement was in someone else's name and did not allow others to drive the vehicle without written permission; Green's rental agreement had expired.

> Viewing the facts in the light most favorable to the government, we cannot say that Trooper Roberts's failure to complete the stop before the dog alerted was unreasonable. Trooper Roberts began a computer check of Bell's license immediately upon his first return to the patrol car. Waiting for the results of the license check was clearly within the purpose of the initial stop, and only while waiting for the results of that check did the Officers discuss whether to call [the K9 officer] to walk the dog around the car. Because the officers already were waiting for the results of the background check, any time that the Officers spent in pursuing other matters while the background check was processing, even if those matters were unrelated to the original purpose of the stop, did not extend the length of the stop. Once Trooper Roberts received the results of the license and warrant checks, on his second return to the patrol car, he decided to issue a warning and then almost immediately walked back to Bell's car and began writing the warning and discussing it with Bell. It was during this discussion that the dog alerted. At no time did the actions of the Officers improperly extend the length of the stop.

*Id.* In this case, Trooper Williams invited Mr. Green into his patrol car while he ran records and issued the warning notice. The routine portions of the traffic stop were on-going when Trooper Williams asked Mr. Green to have a seat in the patrol car. The routine portions of the traffic stop were also on-going when Trooper Williams asked Mr. Green about his travel plans, where he was coming from, and what he had been doing in St. Louis. The video entered into evidence shows that Trooper Williams continues typing on his computer throughout this process including while asking Mr. Green the questions in controversy. Furthermore, Trooper Williams was still working on the warning notice when the drug detecting dog alerted on the car. The video evidence shows Trooper Williams typing on his computer—ostensibly working on the warning notice—while the K9 officer deployed the drug detecting dog. Like in *Bell*, neither the questions asked by Trooper Williams nor the deployment of the drug dog unreasonably extended the period of Mr. Green's detention. Therefore, Mr. Greens motion to suppress is denied.

Mr. Green cites *United States v. Rodriquez* and argues that "[e]ven though only 7 or 8 minutes had passed from the time of the warning until the dog indicated drugs, they held this was not permissible." The government, however, highlights the key distinction between *Rodriquez*

and the case before this Court: "In *Rodriquez*, the officer had [completed] the citation and had to wait several minutes for a K-9 to arrive on scene." (DN30 at 6). Unlike the officer in *Rodriquez*, Trooper Williams was still working to complete the warning notice when the dog alerted on Mr. Green's car. In fact, the officer in *Rodriquez* testified that he "had all their documents back and a copy of the written warning. I got all the reason[s] for the stop out of the way[,] . . . took care of all the business." 135 S.Ct. at 1613 (quoting record testimony). This distinction is critical and *Rodriquez* is not instructive in this case.

II.     **The search of Mr. Green's cellphones was lawful.**

Mr. Green argues that the search warrants executed on his cell phones lacked probable cause because the affidavit underlying the warrant does not show a nexus between his cell phones and the crime at hand. The Court disagrees. "Probable cause exists when there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001) (quotation marks and citations omitted). When reviewing the sufficiency of an affidavit, Courts should proceed "in a commonsense, rather than hypertechnical manner" and "review of an affidavit and search warrant should rely on a 'totality of the circumstances' determination, rather than a line-by-line scrutiny." *Id.* (citations omitted).

The government accurately summarizes the contents of the underlying affidavit as follows:

> The affidavit at issue described the controlled substance offense, the facts that led to the defendant's arrest, and relied on the training and experience of a veteran narcotics detective and DEA task force officer, Daniel Jones. The affidavit described the seizure of 250 pounds of marijuana as well as the seizure of 5 cell phones. It further detailed the defendant's cross-country trip to a marijuana source state, Colorado. The affiant further relied on his training and experience in the field of narcotics investigations to opine that drug traffickers commonly use cell

phones to communicate with others in the drug trade. The affidavit goes on to describe the benefits, to drug traffickers, of having multiple cell phones and the commonality of stored information pertinent to their drug trades.

(DN 30 at 7-8). The Court finds that these facts, considered in the totality of the circumstances, provided the issuing magistrate with a substantial basis for concluding that probable cause existed. The inclusion of the substantial amount of contraband, evidence of cross-country drug transportation, multiple cell phones, and the affiant's significant law enforcement experience are particularly persuasive. Because the four corners of the affidavit contained sufficient content to provide the magistrate with a substantial basis for concluding that probable cause existed to search Mr. Green's cell phones, the motion to suppress is denied.

## ORDER

For the foregoing reasons, **IT IS HEREBY ORDERED**, Defendant Green's motion to suppress (DN 21) is **DENIED.**

*Thomas B. Russell*

**Thomas B. Russell, Senior Judge**
**United States District Court**

January 9, 2020

CC:   Counsel of Record